[Cite as *Wiest v. Carmosino*, 2019-Ohio-3536.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLERMONT COUNTY

| | | |
|---|---|---|
| DEBRA WIEST, | : | |
| Appellee, | : | CASE NO. CA2018-10-073 |
| | : | O P I N I O N |
| - vs - | | 9/3/2019 |
| | : | |
| RICHARD CARMOSINO, | : | |
| Appellant. | : | |

APPEAL FROM CLERMONT COUNTY COURT OF COMMON PLEAS
DOMESTIC RELATIONS DIVISION
Case No. 2010DRA00733

Stagnaro Hannigan Koop, Co., LPA, Michaela M. Stagnaro, 30 Garfield Place, Suite 760, Cincinnati, Ohio 45202, for appellee

John Woliver, 204 North Street, Batavia, Ohio 45103, for appellant

**HENDRICKSON, P.J.**

{¶ 1} Richard Carmosino appeals from the decision of the Clermont County Court of Common Pleas, Domestic Relations Division, which denied his motion for contempt against his former spouse, Debra Wiest. For the reasons discussed below, this court affirms the domestic relations court's decision.

{¶ 2} Carmosino ("Father") and Wiest ("Mother") married in 1991. Their first child, born in 1995, is now an adult, and their second child, C.C., was born in 2006. Father and Mother divorced in 2011.

{¶ 3} The divorce was highly contentious. Ultimately, the court named Mother residential parent and legal custodian of C.C. and awarded Father parenting time on one weekday overnight and on alternating weekends.

{¶ 4} Much of the acrimony between the parties can be traced to Father's romantic relationship with Brittnye Bowman, a relationship which began prior to the divorce. Mother and the children apparently blamed Bowman for the divorce. By the time of the events of this case, Father and Bowman had been in a relationship for approximately eight years and were living together.

{¶ 5} In early 2017, C.C., then 10 years old, began refusing to go visit Father during Father's parenting time. C.C. wished to visit with his Father but did not want to interact with Bowman because her behavior was causing him anxiety. Mother did not force C.C. to visit with Father, allegedly on the advice of C.C.'s counselor.

{¶ 6} In June 2017, Father moved for a contempt order against Mother for failing to honor his parenting time from March 2017 to June 2017. A magistrate held a hearing on that motion in August 2017, at which Father, Mother, and the counselor testified. Later, the magistrate issued a decision recommending the domestic relations court find Mother in contempt for failing to honor Father's parenting time.

{¶ 7} Mother objected to the magistrate's decision, and the objections were overruled by the domestic relations court. The court concluded that Mother had failed to prove she was justified in her decision not to force C.C. to visit with Father during his parenting time. Specifically, the court found that the counselor's testimony – indicating he recommended Mother not to force C.C. to visit – carried little weight, given that the counselor also testified that he would never advise a parent to force a child to spend time with the other parent due to potential malpractice concerns. Additionally, the court found that the evidence did not

support a finding that C.C.'s anxiety rose to the level that parenting time with Father would cause C.C. physical or mental harm.

{¶ 8} Mother appealed. *Carmosino v. Carmosino*, 12th Dist. Clermont No. CA2018-01-002, 2018-Ohio-3010. Mother argued that she was justified in not forcing C.C. to visit Father because of evidence in the record that C.C. would suffer physical or mental harm. This court rejected that argument and affirmed the domestic relation court's decision, concluding that, while the record contained some evidence that C.C. could suffer harm (mostly through Mother's own testimony), the domestic relations court had given this evidence little weight and this court would not reverse a contempt action on the basis of a difference of opinion on questions of credibility or the weight of the evidence. *Id.* at ¶ 17.

{¶ 9} In September 2017, the court appointed a guardian ad litem ("GAL") for C.C. and ordered the GAL to investigate and make a written custody recommendation. In November 2017, Father filed a second contempt motion which alleged that Mother had denied Father parenting time with C.C. between June and November 2017. In December 2017, the GAL submitted a written custody recommendation ("GAL report"), which recommended that Father have parenting time with C.C. but exercise the parenting time without Bowman present.

{¶ 10} The second contempt motion was heard by the court during an April 2018 hearing.[1] Mother, Father, Bowman, and the GAL testified.[2] Following the hearing, the magistrate interviewed C.C. in camera.

---

1. The hearing also involved motions filed by Mother to suspend Father's parenting time, modify the visitation schedule, and to add Bowman as a party to the case. The court denied the motion to suspend Father's parenting time but granted the motion to modify the visitation schedule, ending Father's overnight visitation and mandating that Father ensure that Bowman was not present during parenting time with C.C. The decision further provided that upon demonstration of compliance with the court's order, Father could regain overnight visitation with C.C. The court denied the motion to add Bowman to the case. Neither decision was appealed.

2. Father also called several friends to testify about the good relationship between he, C.C., and Bowman before early 2017.

- 3 -

{¶ 11} The magistrate issued a decision recommending that the domestic relations court find that Mother violated a court order by not facilitating Father's parenting time, but that she should not be held in contempt. The decision explained that Father failed to "create an environment where [C.C.] would feel comfortable spending time with his father. This is an important distinction between the evidence presented at the hearing on April 17, 2018, and the evidence presented at the hearing on August 25, 2017."

{¶ 12} Father objected, arguing that the magistrate had created an "unworkable" and "unlawful" standard for excusing a violation of a court order. Father argued that a finding that he created a situation that was "uncomfortable" for C.C. was not sufficient justification for Mother's failure to honor his parenting time by forcing C.C. to visit. Father argued that there must be evidence of a threat of or actual physical or mental harm before Mother would be justified in not facilitating his parenting time.

{¶ 13} The court overruled Father's objection and adopted the magistrate's decision. The court agreed with the magistrate's assessment that Father had refused to create an environment where C.C. was comfortable. Father appeals, raising two assignments of error.

{¶ 14} Assignment of Error No. 1:

{¶ 15} THE TRIAL COURT ERRED AS A MATTER OF LAW BY APPLYING A VAGUE AND INCONSISTENT STANDARD OF CONDUCT IN NOT HOLDING APPELLEE IN CONTEMPT OF ITS PARENTING ORDER.

{¶ 16} Father argues that the domestic relations court erred in determining that Mother was justified in not forcing C.C. to visit him based on an improper legal standard, i.e., because Father had refused to take steps to make C.C. "comfortable" during his visits. Father argues that Mother's failure to facilitate his parenting time would only be appropriate if "extraordinary circumstances" were shown to exist, which Father argues were not demonstrated here.

- 4 -

{¶ 17} Disobedience to court orders may be punished by contempt. R.C. 2705.02(A). This court reviews a domestic relations court's determination of a contempt motion for an abuse of discretion. *Ware v. Ware*, 12th Dist. Warren No. CA2001-10-089, 2002 Ohio App. LEXIS 887, *3 (Mar. 4, 2002), citing *State ex rel. Ventrone v. Birkel*, 65 Ohio St.2d 10, 11 (1981). An abuse of discretion implies that the domestic relation court's attitude was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). When applying the abuse of discretion standard, this court is not free to merely substitute its judgment for that of the domestic relations court. *Berk v. Matthews*, 53 Ohio St.3d 161, 169 (1990).

{¶ 18} The right of visitation should be denied only under extraordinary circumstances, such as the unfitness of the non-custodial parent or a showing that the visitation would cause harm. *Ware* at *5, citing *Newhouse v. Toler*, 8th Dist. Cuyahoga No. 71834, 1997 Ohio App. LEXIS 5192, *11-12 (Nov. 20, 1997). When a court establishes a visitation schedule concerning the minor children of the parties, in the absence of proof showing that visitation with the non-custodial parent would cause physical or mental harm to the children, or a showing of some justification for preventing visitation, the custodial parent must do more than merely encourage the minor children to visit the non-custodial parent. *Id.* at *5-6. Thus, the custodial parent has an obligation to encourage and facilitate court-ordered visitation of minor children with the noncustodial parent. *Sayers v. Sayers*, 4th. Dist. Athens No. 1202, 1984 Ohio App. LEXIS 11773, *1 (Dec. 7, 1984).

{¶ 19} Some factors to be considered are the age of the child, and whether that age indicates the ability to "affirmatively and independently" decide not to have visitation with the noncustodial parent. *Smith v. Smith*, 4th Dist. Pike No. 397, 1988 Ohio App. LEXIS 239, *14 (Jan. 27, 1988). If the child can express a preference, those preferences are to be taken into consideration and a mature child's preferences are to be given greater weight. *Id.* at *16.

However, a child's preference must be disregarded to the extent it is determined that the child has been influenced by the custodial parent, is merely parroting the custodial parent's wishes, lacks understanding, or has not known the noncustodial parent. *Id.* at *16-17, citing *Pettry v. Pettry*, 20 Ohio App. 3d 350, 352-353 (8th Dist.1984).

{¶ 20} At the hearing, the GAL testified concerning her investigation. Bowman and C.C. initially had a good relationship. However, this changed in early 2017, when Bowman began pressuring C.C. to say "I love you" and to say that he loved her more than he loved his mother. This intimidated C.C. and caused him anxiety. Instead of dissuading this behavior, Father continued to insert Bowman into his parenting relationship with C.C., causing C.C. to feel alienated. Father refused to recognize or appreciate C.C.'s concerns with Bowman, which caused C.C. to believe that Father prioritized his relationship with Bowman over him. C.C. was aware his Father was calling the police on him when he would not appear for visitation and the anxiety surrounding the situation with Bowman and visitation had become "crippling." The GAL testified that Father and C.C. were clearly bonded and recommended that Father have parenting time so long as Bowman was not present. The GAL recommended reunification therapy sessions with C.C. and Father.

{¶ 21} Mother testified about C.C.'s anxiety concerning visiting with Father and with regard to his anxiety concerning interactions with Bowman. Mother testified that C.C. developed stomach aches and began wanting to sleep in her bed. Mother further testified that Father had called the police numerous times when C.C. did not appear for visitation, that the police would interview C.C., and then would not force him to visit with Father. The record contains documentary evidence of at least 10 police contacts involving missed visitations between July and September 2017. Mother testified that the police had been sent both to her home and to C.C.'s school between September 2017 and December 2017 and that C.C. reacted to the police interactions with tears, stress, and shaking.

{¶ 22} Father testified concerning his frustration with not having parenting time with his son for many months. Father had seen C.C.'s reaction to seeing Bowman, which he described as "ridiculous" and that "he acts like he's just saw the devil." He could not understand C.C.'s reaction because prior to May 2017, C.C. and Bowman had a good relationship. Father testified that he would not meet with C.C.'s counselor because he did not trust him.

{¶ 23} Bowman testified and when asked to describe her relationship with C.C., described it as a "normal parent relationship." She would ask C.C. whether it was okay if she attended his school extracurricular events and most of the time he would say he did not care and so she would attend his events. Bowman further testified that C.C. was 10 years old and "I believe that he knows what his best wishes are." Bowman testified that Mother was "unstable" and caused problems.

{¶ 24} The magistrate's decision indicated that it also relied upon the content of the GAL report.[3] The report indicated that Father and Bowman's romantic relationship began prior to the divorce and had been a continuous cause of conflict in the family. Both C.C. and his adult sister viewed Bowman as the cause of the divorce. Nonetheless, Father decided to insert Bowman into their lives and did so too early, which had resulted in conflict.

{¶ 25} The report indicated that Father "places his relationship with Brittnye above all else, including his relationship with his children." Father had told C.C.'s counselor "I have to give Brittnye [C.C.] because I cannot give her a baby." Father was "obsessed" with this intention, to the detriment of all of his other relationships. Father had a "crippling lack of self-awareness and inability to separate his relationship with Brittnye from his relationship with his son." When the Gal asked Father why he was not willing to agree to exercise his parenting

---

3. Neither party objected to the court's consideration of the report or any potential hearsay statements within the report.

time without Bowman present he responded, "[s]he just wants to be a part of his life!"

{¶ 26} The GAL opined that Father's other primary focus was himself. The GAL observed this behavior firsthand when she observed the interactions between Father and C.C. at a meeting at a coffee shop. As opposed to asking about C.C.'s well-being or life, Father decided to make comments such as "[w]hy aren't you calling me back? Don't I deserve a call back? How do you think that makes me feel?" Father also inappropriately discussed the domestic relations case with C.C. and had to be admonished by the GAL. Nonetheless, it was obvious that Father and C.C. were well bonded.

{¶ 27} The GAL recommended that the court conduct an in camera interview with C.C. The GAL described C.C. as honest and intelligent and thought he would voice his opinion. The GAL reported that C.C. was adamant that he did not want to interact with Bowman. Bowman caused C.C. "intense" anxiety. C.C. would feel anxious any time that Bowman would appear at his sporting and school events. C.C. was angry at Father for calling the police on him and choosing his relationship with Bowman over his relationship with him. C.C. reported that when the two of them were alone, Father "usually talks about Brittnye and makes me feel bad because I don't like her." C.C. reported that Bowman "tells me I need to love her more than my mom. She freaks me out, but I do miss seeing my dad." C.C. reported being afraid that Father would attempt to kidnap him.

{¶ 28} C.C.'s school principal reported that for the past two and one half years there had been many problems all stemming from Father's desire for Bowman to have a "deeper role" in C.C.'s life. This included Bowman showing up unannounced at C.C.'s school, signing up to volunteer at C.C.'s events, contacting C.C.'s coaches, and attending C.C.'s events even though the court had ordered Father to dissuade Bowman from such activities. Mother had begun taking C.C. out of school early so he would not have to see Bowman when Father

attempted to exercise his parenting time. The principal reported that "anxiety and catastrophic thinking have become part of [C.C.]'s thinking."

{¶ 29} C.C.'s counselor confirmed that he advised Mother not to force C.C. to visit with Father and that visits were not in C.C.'s best interest. The counselor stated that C.C. "adores" his Father but simply does not want to interact with Bowman. The counselor stated that Father's refusal to abide by C.C.'s request to not see Bowman was not in C.C.'s best interest. Father's repeated calling of police also strongly contributed to C.C.'s feelings of anxiety and distrust in his Father. C.C. had nightmares related to his Father calling the police on him. The counselor diagnosed C.C. with intense adjustment disorder with anxiety and depression and recommended Prozac. C.C.'s pediatrician prescribed Prozac, which C.C. began taking in September 2017 to treat anxiety.

{¶ 30} The report opined that Bowman may "lack boundaries." She consistently attempted to insert herself uninvited into C.C.'s life. She sent flowers to the home of the magistrate. Her behavior was a primary source of conflict in the family.

{¶ 31} Based upon a thorough review of the record, this court does not find that the domestic relations court abused its discretion in declining to find Mother in contempt. The GAL described C.C. as honest and intelligent. C.C. had alleged troubling and inappropriate behavior by Bowman, and the behavior was promoted by Father. When confronted with his son's concerns, Father's response was to deny that anything inappropriate occurred and act as if C.C.'s, Mother's, and the counselor's concerns were ridiculous. Father demonstrated a lack of insight into the problem and further demonstrated that he was not capable of protecting C.C. from Bowman's inappropriate behavior. The conflict caused C.C. anxiety, which resulted in physical effects and behavioral changes observed by Mother. C.C. was prescribed Prozac due to anxiety at the behest of C.C.'s counselor and pediatrician.

**{¶ 32}** The GAL, both through her report and testimony, provided an objective viewpoint corroborating the concerns and establishing that C.C. experienced "extreme" anxiety because of Bowman's actions and Father's refusal to acknowledge the issue. Father exacerbated the situation by repeatedly calling the police, who would then confront C.C. at his home or school, despite Father's understanding that the police would not force C.C. to visit with him after they spoke with the child. C.C. was mature enough to discuss these issues with the GAL and did so with the magistrate in camera.[4] In sum, the record contains evidence of circumstances sufficiently extraordinary to excuse Mother from forcing C.C. to attend visits.

**{¶ 33}** Father argues that the magistrate and domestic relations court's statement that Father refused to make C.C. "comfortable" indicates the application of an improper or confusing legal standard. Father is correct that a child's "comfortability" is not the standard for justifying failure to honor parenting time. However, the remark about comfort must be read in the context it was presented in the decision. The discussion on contempt also referenced other factual findings mentioned earlier in the decision.[5] Thus, the language was used as a means of summarizing the issue rather than a declaration of the applicable legal standard. Rather than mere discomfort, the record contains evidence supporting the

---

4. Notably, the magistrate's interview with C.C. occurred after Father had resumed exercising parenting time following the court's December 2017 decision. That decision included a temporary order granting Father visitation on Wednesdays and Saturdays, which he exercised. Thus, the child had not been isolated from his Father at time of the court's interview.

5. The magistrate's decision regarding contempt read in full:

> [Father] alleges that [Mother] should be found in contempt for denying him parenting time on several specific dates listed in his Motion. [Mother] acknowledges that [Father] did not exercise parenting time on those dates. The Court finds that [Mother] violated a Court order. However, the Court declines to find [Mother] in contempt. The Court relies on the information and recommendations in the GAL Report and the findings set forth above. The Court finds that [Father] refused to create an environment where [C.C.] would feel comfortable spending time with his father. This is an important distinction between the evidence presented at the hearing on April 17, 2018, and the evidence presented at the hearing on August 25, 2017. [Father's] Motion for Contempt is denied.

conclusion that C.C.'s anxiety in Bowman's presence – caused by Bowman's inappropriate behavior and Father's promotion of such behavior – rose to a level of potential harm justifying Mother's actions. The court's decision to excuse Mother from a contempt finding was reasonable under the specific facts of this case and not an abuse of discretion. Accordingly, this court overrules Father's first assignment of error.[6]

**{¶ 34}** Assignment of Error No. 2:

**{¶ 35}** THE TRIAL COURT ERRED AS A MATTER OF LAW BY PERMITTING THE SAME FACTS TO BE RELITIGATED.

**{¶ 36}** In his next assignment of error, Father argues that the court improperly allowed Mother to "relitigate" issues decided in the first contempt motion. Father argues that the "issue of whether parenting time between father and son was harmful to C.C. had been litigated and determined" in the first contempt hearing.

**{¶ 37}** Father's argument suggests that because the court found that Mother failed to prove justification for not facilitating visitation between March and June 2017, she would be collaterally estopped from proving that her actions were justified in a subsequent contempt proceeding concerning different dates. This argument is meritless. Domestic relations cases and parenting issues are fluid and develop over time. A domestic relations court is not limited in its determination of ongoing issues simply because it decided an issue one way based on the evidence before it on that day.

**{¶ 38}** In the first hearing on contempt, the court found that most of the evidence of alleged anxiety suffered by C.C. came through Mother's testimony. The court did not attribute great weight to that testimony and accordingly found that Mother had failed to justify her actions. However, in the second hearing the court heard the GAL's testimony and

_____

6. Father also argues that the court violated the law of the case doctrine by applying the correct legal standard to his first contempt motion but altering the legal standard for the second contempt motion. This argument has no

received her report, considered the testimony of Bowman and observed her demeanor, and conducted an in camera interview with C.C. The court also had the additional evidence concerning Father's repeated attempts to use the police to secure C.C. for visitation. Thus, the court had substantially more evidence before it from which it concluded that Mother's actions were justified.

{¶ 39} Father also suggests that the court should not have considered facts related to what occurred prior to June 2017. "Child custody matters do not exist in a vacuum." *In re Ghadr*, 4th Dist. Hocking Nos. 95CA22 & 96CA6, 1997 Ohio App. LEXIS 1253, *12 (Mar. 19, 1997). Events that occurred over the entire course of Father's lost parenting time were relevant to whether Mother was justified in refusing to force C.C. to attend visitation for the time in question. This court overrules Father's second assignment of error.

{¶ 40} Judgment affirmed.

S. POWELL and PIPER, JJ., concur.

---

merit as there is no evidence that the court used an alternative legal standard.